## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                           Case No. 19-cr-208 (MJD/ECW)

               Plaintiff,

v.                                                  **REPORT AND RECOMMENDATION**

Cristino Martinez Padilla (2),

               Defendant.

On August 13, 2019, Defendant Cristino Martinez Padilla ("Padilla" or "Defendant") was indicted on one count of Conspiracy to Distribute Methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.  (Dkt. 21.)  This matter is before the Court on Defendant's Motion to Suppress Statements (Dkt. 35) and Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 36).  Thomas M. Hollenhorst, Assistant U.S. Attorney, appeared on behalf of the United States of America and Lee R. Johnson, Johnson & Greenberg PLLP, appeared on behalf of Padilla, who was present at the hearing.  The case was referred to United States Magistrate Judge Steven E. Rau for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  The undersigned held a hearing on the motions on September 26, 2019.[1]  (Dkt. 55.)  For Defendant's motion to suppress statements, the Court received into evidence a recording of Defendant's statements (Gov't Ex. 1), and a partial

---

[1]    This case has been reassigned to the undersigned due to the passing of Magistrate Judge Rau.

transcript/translation of the recording (Gov't Ex. 2). With respect to Defendant's challenge to the search warrant, the Court received into evidence a July 17, 2017 search warrant. (Gov't Ex. 3.) Post-hearing briefing is complete (Dkts. 64, 66), and these motions are ripe for a determination by the Court. Based on the files, records, and proceedings herein, the undersigned recommends that Defendant's Motion to Suppress Statements be granted and Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.

## I.     BACKGROUND

Padilla was arrested on July 17, 2019 after police seized approximately ten pounds of methamphetamine from a car he was riding in with one of his co-defendants. (Dkt. 61 at 6:21-7:7.) Hennepin County Sheriff's Deputy Jeremiah Jessen applied for a search warrant for Padilla's residence, and the warrant was issued later that day by the Ramsey County District Court. (Gov't Ex. 3.) Police recovered approximately 19 pounds of suspected methamphetamine from Padilla's residence. (Dkt. 61 at 7:11-20.)

The police visited Padilla on July 18, 2019 at the Hennepin County Jail to conduct an interview.[2] (Gov't Ex. 2.) Officer Johnson, who speaks Spanish, acted as a translator. (*See id*. at 2.) A recording of the interview was transcribed and translated by a federally certified Spanish court interpreter, and the parties have stipulated to the admissibility and accuracy of the first five minutes of the transcript/translation. (Dkt. 64 at 2; Dkt. 66 at 1-

---

[2]     An officer conducting the interview mistakenly stated that the interview occurred on January 18. (Gov't Ex. 2 at 2.)

2.)  The transcript/translation notes that "[Officer Johnson] speaks Spanish with an accent that is at times difficult to understand.  Her Spanish also contains some incorrect usage and awkward turns of phrase."  (Gov't Ex. 2 at 1.)  The Court has reviewed the transcript/translation and listened to the recording.

One of the officers began the interview by asking Officer Johnson to let Padilla know that they would like to ask him some questions but would need to read him his rights first.  (*Id.* at 2.)  Padilla had previously signaled that he did not have his glasses to read, so Officer Johnson read the rights out loud as follows:

> (So), um, before asking you questions, I'm going to make you aware of your rights. You have the right to remain silent.  Anything you say can be used against you in court.  You have the right to consult with an attorney and to have that attorney present during questioning.  If you can't afford the services of an attorney, one will be appointed to you for free so he can give you advice before and during any questioning you wish.  You have the right to end any questioning at any time.  Do you understand what your rights are?[3]

(*Id.* at 2-3 (footnote omitted).)  Padilla responded "No."  (*Id.* at 3.)  The transcript/translation notes that the word "interrogatorio," the Spanish word for "questioning," was not clearly pronounced in the statement "You have the right to consult with an attorney and to have that attorney present during questioning."  (*Id.* at 3 n.1.)

After Padilla said "No," Officer Johnson asked "No?  Do I want that I read again?" and Padilla responded "rights u/i."  (*Id.* at 3.)  (The interpreter used "u/i" in the transcript/translation to identify unintelligible speech.  (*Id.* at 1.))  Officer Johnson then

---

[3]  The Court quotes the English words for words spoken in Spanish.

explained to the other officers that "Ah, he's claiming that he doesn't understand his rights so I'm asking whether or not he wants me to re-read them."[4]  (*Id.* at 3.)

Officer Johnson then asked "Uh, do you want that I read the, the rights again." (*Id.*)  Padilla responded "The rights, uh-huh," to which she said "Okay.  Again?"  (*Id.*) Padilla then said:

> The rights, right?  What you read to me, like, just now.  That I will answer your questions.  That I'm going to answer the questions, that I'm going to court, and if I don't have money, the court will give me a, a lawyer.

(*Id.* at 3.)  It is unclear whether Padilla was restating what he thought his rights were or whether Padilla was trying to explain to Officer Johnson what he was asking her to re-read.  Regardless, Padilla's restatement did not mention the right to have an attorney present during questioning.  Officer Johnson responded "Mm-hm" to Padilla's restatement of his rights.

After Officer Johnson's affirmative response, Padilla said, "Yes, I understood." (*Id.* at 3-4.)  Officer Johnson asked "So, you, you understand everything I read?"  (*Id.* at 4.)  Padilla responded "Yes.  Yes." (*Id.*)

Officer Johnson asked if Padilla had any questions and the following exchange occurred:

> Padilla:    Well, I don't know what's going to happen to me, I don't know what . . .
>
> Johnson:    Right now at this moment, or . . .

---

[4]      The Court includes Officer Johnson's comments to the other officers for completeness, but has not relied on them in making its determination as to waiver.

| | |
|---|---|
| Padilla: | Uh-huh, u/i you're going to ask me questions. |
| Johnson: | Uh-huh. |
| Padilla: | Yes, all right. |
| Johnson: | Okay. |
| Padilla: | Yes. |
| Johnson: | I want that I read |
| Padilla: | I |
| Johnson: | The questions [sic] again? |
| Padilla: | Yes. |
| Johnson: | Okay. |
| Padilla: | Yes. |

(*Id.*)

Notwithstanding the fact that Padilla responded "Yes" twice when asked if he wanted the "questions" again, Officer Johnson did not read anything (the *Miranda* rights or questions) to Padilla. (*Id.*) Instead, she said to the other officers "Sounds like he had a question about the court process? And being assigned a lawyer? Uh, he's, he's claiming that he understands what I have just read." (*Id.* at 4-5.) Officer Johnson then asked Padilla "Do you want to waive the abovementioned rights and talk to us now?" (*Id.* at 5.) Padilla asked "Well, what do you guys think?" and the following dialogue ensued:

| | |
|---|---|
| Johnson: | Hmm? |
| Padilla: | Well, I feel like there's nothing wrong with that, right? Talking, I mean we're going to tell the truth, we're not going to say things that aren't u/i |

| Johnson: | [Say that] ag-again, a little slower. |
|---|---|
| Padilla: | I mean so far here right now we're going, you're going to ask me questions. |
| Johnson: | Uh-huh. |
| Padilla: | Right? Well I feel like, I mean, the questions you need to ask me, I think there's no . . . there's no problem. |
| Johnson: | So, we can ask you questions? Is that okay? |
| Padilla: | Yes. |

(*Id.*) Officer Johnson then informed the other officers in English that Padilla said it was okay if they ask him questions. (*Id.* at 6.)

Officer Johnson then confirmed with Padilla:

| Johnson: | And, and you do understand all those rights here. And are you feeling okay talking to us? |
|---|---|
| Padilla: | Yes. So, what you're u/i here that, that there's a lawyer u/i to court? |
| Johnson: | Uh-huh. |
| Padilla: | So in court, there will be a, a lawyer. |
| Johnson: | In court, yes. |
| Padilla: | Yes. But this isn't court here right now? |
| Johnson: | Right—right now isn't—isn't court. Right now we want to ask you questions. |
| Padilla: | Oh. u/i |
| Johnson: | But if you don't want to answer the questions that's okay. |

6

| | |
|---|---|
| Padilla: | Okay. Yes. I will answer you. |
| Johnson: | Okay. |
| Padilla: | Yes. |

(*Id.*)

Officer Johnson told the other officers that Padilla had questions about whether he would be assigned a lawyer during the court case, she told him they were not in court and they just wondering if he would be willing to speak with them, and he was saying he was. (*Id.*) Another officer, speaking English, said that Padilla would get an attorney "tomorrow." (*Id.* at 7.) Officer Johnson continued the conversation with Padilla:

| | |
|---|---|
| Johnson: | Uh, there's a lawyer tomorrow during this process court. |
| Padilla: | But tell him I don't have money. |
| Johnson: | Uh, there's one to free. |
| Padilla: | There is? |
| Johnson: | Mm-hm. [Speaking English: So, I explained to him that, tomorrow, there'll be a lawyer for him. He's claiming that he doesn't have any money. And I explained that it's just a free lawyer] Is it okay? |
| Officer: | [Speaking English: And he's okay to speak with us now, then?] |
| Padilla: | Yes, in Spanish. |
| Johnson: | Uh, I'm translating what you told me, uh-huh. |
| Padilla: | Uh-huh. |
| Johnson: | Okay? |

| Padilla: | Yes. |
|---|---|
| Johnson: | Are you feeling okay right now talking to us? |
| Padilla: | Yes. |

(*Id.*)  The officers then began to question Padilla.

## II.    DISCUSSION

### A.    Motion to Suppress Statements

Before questioning a suspect who is in custody, law enforcement must inform a suspect that: (1) they have a right to remain silent; (2) their statements may be used against them at trial; (3) they have the right to the presence of an attorney during questioning; and (4) if they cannot afford an attorney, one will be appointed.  *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  The right to counsel recognized in *Miranda* is sufficiently important to suspects in criminal investigations that it requires the special protection of the knowing and intelligent waiver standard.  *Davis v. United States*, 512 U.S. 452, 458 (1994).  The validity of a *Miranda* waiver entails a two-part inquiry: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998).  Only when the totality of circumstances reveals both an uncoerced choice and the requisite level of comprehension may a court properly concluded that a suspect has waived his *Miranda* rights.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Padilla argues that (1) the totality of the circumstances establishes that he did not knowingly waive his right to counsel and did not understand he could have an attorney present during his interrogation (Dkt. 64 at 7-8) and (2) that the U.S. Supreme Court cases *California v. Prysock*, 453 U.S. 355 (1981), and *Duckworth v. Eagan*, 492 U.S. 195 (1989), and the Eighth Circuit's decision in *United States v. Caldwell*, 954 F.2d 496 (8th Cir. 1992), establish that he was not adequately informed of his right to counsel (*id.* at 8-13).  The Court will first address whether the *Miranda* warnings given Padilla were adequate and then address whether Padilla made a knowing and intelligent waiver of his right to have counsel present during questioning.[5]

### 1.    The *Miranda* warnings given Padilla were facially adequate

In *Prysock,* the Supreme Court addressed the question of whether the warnings given to the defendant before a recorded conversation with a police officer satisfied the requirements of *Miranda*.  453 U.S. at 355.  The tape of the questioning reflected that police informed the defendant that he had the right to talk to a lawyer before he was questioned, to have the lawyer present while being questioned, and all during the questioning.  *Id.* at 356.  The defendant was then informed that he had the right to have a lawyer appointed to represent him at no cost to himself.  *Id.* at 357.  The defendant, a juvenile, had his parents present and the defendant's mother asked if the defendant could still have a lawyer at a later time if he gave a statement at that time without one.  *Id.*  The officer informed the defendant's mother that he "would have an attorney when he went to

---

[5]    The parties do not dispute that Padilla was in custody or that any waiver was uncoerced.

court and that 'he could have one at this time if he wished one.'" *Id.* The California Court of Appeal reversed the defendant's conviction on the ground that he was not properly advised of his right to the services of a free attorney before and during interrogation. *Id.* at 358. In reversing the California Court of Appeal, the Supreme Court rejected the notion that *Miranda* warnings needed to "be a virtual incantation of the precise language contained in the *Miranda* opinion" and held that the *Miranda* warnings given to the defendant were adequate because he was told of his right to have a lawyer present prior to and during interrogation, and his right to have a lawyer appointed at no cost if he could not afford one. *Id.* at 355, 361. The Supreme Court held that the California Court of Appeal erred in holding that the warnings were inadequate simply because of the order in which they were given. The Supreme Court explained that nothing in the *Miranda* warnings given to the defendant suggested any limitation on the right to the presence of appointed counsel different from the clearly conveyed rights to a lawyer in general, including the right to a lawyer before and during all questioning. *Id.* at 360-61.

Padilla argues that *Prysock* is significant because it distinguished the circumstances of *Prysock* from cases where the police had expressly linked the right to appointed counsel to a future time after police interrogation. (Dkt. 64 at 9.) Indeed, *Prysock* explained that it was not a case in which the defendant was not informed of his right to the presence of an attorney during questioning or in which the offer of an appointed attorney was associated with a future time in court. 453 U.S. at 361. Here, however, the *Miranda* warning given Padilla at the beginning of the questioning

informed him that he had the right to have an attorney present during questioning and one would be appointed to him "for free so he can give you advice before and during any questioning you wish." (Gov't Ex. 2 at 2-3.) *Prysock* thus does not support Padilla's argument that the *Miranda* warnings were inadequate.

Next, in *Duckworth*, the Supreme Court held that "informing a suspect that an attorney would be appointed for him 'if and when you go to court'" does not render *Miranda* warnings inadequate. 492 U.S. at 200-201. The Supreme Court explained that the prophylactic *Miranda* warnings are not themselves rights protected by the Constitution, but rather, measures intended to ensure that the right against compulsory self-incrimination is protected. *Id.* at 203. It followed by stating that the inquiry, therefore, is "simply whether the warnings reasonably convey to a suspect his rights as recognized by *Miranda*." *Id.* (cleaned up). The Supreme Court noted that the "if and when you go to court" language accurately described the procedure for appointment of counsel at his first court appearance. *Id.* at 204. The Supreme Court reasoned that it is relatively common for a suspect, after receiving *Miranda* warnings, to ask *when* he will obtain counsel, and the "if and when you go to court" advice simply anticipated that question. *Id.* Additionally, *Miranda* does not require that attorneys be producible on call, but only that the suspect be informed that he has a right to an attorney before and during questioning, and that an attorney would be appointed for him if he cannot afford one. *Id. Duckworth* weighs against Padilla's argument that the warnings given were not adequate because, as discussed above, the *Miranda* warnings given Padilla at the beginning of questioning informed him of both rights.

Lastly, in *Caldwell*, the defendant argued that the failure of the detective to advise him of his right to consult with an attorney before and during his interrogation invalidated the warnings provided. 954 F.2d at 497. The detective advised the defendant of his right to remain silent and to an attorney, that anything he said could be used against him, that an attorney would be appointed for him if he could not afford one, that he had the right to a court-appointed attorney, and did not link his right to an attorney to a further point in time after police questioning. *Id.* at 504-505. The Eighth Circuit, reviewing the adequacy of the warning only for plain error, found that the *Miranda* warnings were adequate notwithstanding the defendant's argument that the officer "failed to specifically warn him of his right to counsel before and during the interrogation" because the officer "did, however, generally warn [the defendant] that he had the right to an attorney."[6] *Id.* at 504. Here, the Miranda warnings informed Padilla that he had the right to have an attorney present during questioning and, "If you can't afford the services of an attorney, one will be appointed to you for free so he can give you advice before and during any questioning you wish." (Gov't Ex. 2 at 2-3.)

Padilla argues that *Prysock*, *Duckworth*, and *Caldwell* support suppression of his statements because those cases acknowledged that the result would have been different if the reference to the right of appointed counsel was linked to a future point in time and he argues that his right to appointed counsel was linked to a future point in time—when he

---

[6]     The Eighth Circuit also considered whether Caldwell had made a voluntary, knowing, and intelligent waiver. 954 F.2d at 504-05. It found no coercion, and noted that Caldwell had not "argue[d] that he was incapable of understanding the warnings provided him or the consequences of his decision to waive his rights." *Id.*

was in court.  (*See* Dkt. 64 at 11-12.)  But—as the Supreme Court clarified in

*Duckworth*—*Prysock* did not hold that a *Miranda* warning was necessarily defective

when the warning linked appointment of an attorney to a future point in time, rather, the

"vice referred to in *Prysock* was that such warnings would not apprise the accused of his

right to have an attorney present if he chose to answer questions."  492 U.S. at 205.  The

Court concludes that the *Miranda* warnings given Padilla at the beginning of his

interrogation were not defective on their face because they included the right to have an

attorney present during questioning.

### 2.    Padilla did not knowingly and intelligently waive his right to counsel

Having determined that the *Miranda* warnings given Padilla were not defective,

the Court considers whether Padilla understood those rights and knowingly and

intelligently waived them.  This question is not resolved by the Court's determination that

the *Miranda* warnings given Padilla were adequate, rather, "after the required warnings

are given the accused, if the interrogation continues without the presence of an attorney

and a statement is taken," the burden is on "the government to demonstrate that the

defendant knowingly and intelligently waived his privilege against self-incrimination and

his right to retained or appointed counsel."  *Fare v. Michael C.*, 442 U.S. 707, 724

(1979).  If the Government establishes that a *Miranda* warning was given and the accused

made an uncoerced statement, this alone is insufficient to demonstrate a valid waiver.

*Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).  The Government must also show that

the accused understood these rights.  *Id.*  The Government bears the burden of proving by

a preponderance of the evidence that the defendant knowingly and voluntarily waived his

*Miranda* rights. *United States v. Barahona*, 990 F.2d 412, 418 (8th Cir. 1993). Whether a defendant knowingly and intelligently waived his rights depends on the totality of the circumstances in a case, including the defendant's background, experience, age, familiarity with the criminal justice system, and conduct and demeanor of the defendant during the interrogation. *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981).

Padilla asserts that he is a 53-year-old Mexican citizen with no previous criminal history and was unable to read the *Miranda* warnings without his reading glasses.[7] (Dkt. 64 at 7.) Padilla further asserts that under these circumstances he was not aware he was waiving the right to have counsel present during the investigation. (Dkt. 64 at 8.) He argues that he said he did not understand his *Miranda* rights and that, while he eventually agreed to speak with the officers, he remained confused about the parameters of his right to counsel and did not understand he could have an attorney present during the interrogation. (*Id.*) According to Padilla, when the officers told him he would get an attorney "tomorrow," they effectively contradicted the earlier *Miranda* warning informing him of his right to counsel during interrogation. (*Id.*)

As discussed above, Padilla initially responded "No" when asked if he understood the *Miranda* warnings after the initial reading. (Gov't Ex. 2 at 3.) Officer Johnson asked if he wanted her to read "the rights" again, and Padilla's response was unintelligible except for the word "rights." (*Id.*) Officer Johnson told the other officers that Padilla

---

[7]     The Government does not dispute these assertions, nor has it contended that Padilla understood English.

was "claiming that he doesn't understand his rights" and that she was "asking whether or

not he wants [her] to re-read them." (*Id.*)  The two had the following exchange:

| | |
|---|---|
| Johnson: | Uh, do you want that I read the, the rights again? |
| Padilla: | The rights, uh-huh |
| Johnson: | Okay. Again? |
| Padilla: | The rights, right?  What you read to me, like, just now. That I will answer your questions.  That I'm going to answer the questions, that I'm going to court, and if I don't have money, the court will give me a, a lawyer. |
| Johnson: | Mm-hm. |
| Padilla: | Yes, I understood. |
| Johnson: | Okay. |
| Padilla: | Yes. |
| Johnson: | So, you, you understood everything that I read? |
| Padilla: | Yes.  Yes. |

(Gov't Ex. 2 at 3-4.)

Several facts give the Court pause with respect to this exchange.  First, Padilla said

he did not understand his rights and, when asked if he wanted them re-read to him,

responded affirmatively, but they were not read to him again.  Second, Padilla's

restatement of the rights (which appears to be the reason why the rights were not re-read

to him at this time) omitted the right to have an attorney present during questioning.

Nothing in his restatement suggests that he understood he had the right to have an

attorney present while he was being questioned.  Rather, he stated:  "That I will answer

your questions.  That I'm going to answer the questions, that I'm going to court, and if I don't have money, the court will give me a, a lawyer."  (*Id.* at 3.)  Third, after Padilla recited a version of his rights that omitted the right to counsel during questioning, Officer Johnson replied "Mm-hm," confirming to Padilla that his version was correct.  Finally, the transcription notes that the word "interrogatorio," which means "questioning," was "not pronounced clearly" during the statement "You have the right to consult with an attorney and to have that attorney present during questioning."  (*Id.* at 2-3 & n.1.)

The Government argues that Padilla's initial "No" was not a statement that Padilla did not understand his rights, but rather that he did not understand what Officer Johnson was asking him.  (Dkt. 66 at 7.)  The Government also contends "In fact, after his first response, the defendant immediately paraphrased the rights that were read to him, albeit in odd phrasing, and then affirmatively stated, 'Yes, I understand.'"  (*Id.*)  Perfection is by no means required for a suspect to understand and knowingly waive his *Miranda* rights, but here, the Court cannot view an unequivocal "No" in response to the question "Do you understand what your rights are?" as anything other than a statement that Padilla did not understand what his rights were.  Further, the Court cannot dismiss Padilla's omission of his right to have an attorney present while being questioned as merely "odd phrasing."  Nothing about his statements "That I will answer your questions" and "That I'm going to answer the questions" suggests he knew he could have an attorney present while answering questions.  Rather, his restatement suggests he knew he was going to court and the court would give him a lawyer then if he did not have money.  It also

16

suggests that Padilla did not understand that he did not have to answer any questions or that anything he said during questioning could be used against him in court.

A few moments later, the following exchange occurred when Officer Johnson asked if Padilla had any questions:

| | |
|---|---|
| Padilla: | Well, I don't know what's going to happen to me, I don't know what . . . |
| Johnson: | Right now at this moment, or . . . |
| Padilla: | Uh-huh, u/i you're going to ask me questions. |
| Johnson: | Uh-huh. |
| Padilla: | Yes, all right. |
| Johnson: | Okay. |
| Padilla: | Yes. |
| Johnson: | **I want that I read** |
| Padilla: | **I** |
| Johnson: | **The questions again?** |
| Padilla: | **Yes.** |
| Johnson: | **Okay.** |
| Padilla: | **Yes.** |

(*Id.* at 4 (emphasis added).)

As noted by the interpreter, Officer Johnson's Spanish contained some "incorrect usage" (Gov't Ex. 2 at 1), but it appears from this exchange ("I [sic] want that I read . . . [t]he questions again?") that she intended to ask Padilla if he wanted his rights read again

(because there were no "questions" to be re-read at that time) and he responded "Yes" twice. However, the *Miranda* warnings were not re-read, and instead Officer Johnson said to the other officers "Sounds like he had a question about the court process?" (*Id.* at 4.) Later, the following exchange occurred:

| Johnson: | **And, and you do understand all those rights here. And are you feeling okay talking to us?** |
|---|---|
| Padilla: | **Yes. So, what you're u/i here that, that there's a lawyer u/i to court?** |
| Johnson: | **Uh-huh.** |
| Padilla: | **So in court, there will be a, a lawyer.** |
| Johnson: | **In court, yes.** |
| Padilla: | **Yes. But this isn't court here right now?** |
| Johnson: | **Right—right now isn't—isn't court. Right now we want to ask you questions.** |
| Padilla: | **Oh.** u/i |

(*Id.* at 6 (emphasis added).) It appears that Padilla understood he would have a lawyer when in court and also understood that he was not in court "right now," but instead was being questioned. Rather than suggesting Padilla knew he had a right to an attorney while being questioned "right now," this exchange suggests that he believed he would not get an attorney until he went to court, which was after he was questioned.

In sum, the totality of the circumstances include Padilla's inability to read the written *Miranda* warnings because he did not have his glasses, Padilla's lack of experience with the criminal justice system, the quality of Officer Johnson's translation

when speaking to Padilla, Padilla's response of "No" when asked if he understood his rights after the initial reading of his *Miranda* rights, the fact that Padilla was never again informed of his right to an attorney while being questioned after that initial reading, the fact that Padilla omitted the right to an attorney during questioning when he recited what he understood his rights to be, the fact that his rights were not re-read to him although he responded multiple times that he would like them re-read, and the colloquy regarding the presence of a lawyer while in court combined with the clarification that the questioning "right now" was not "court."

The Court acknowledges that Padilla was told after the initial *Miranda* warnings that he did not have to answer questions and that he agreed to answer questions. (*See, e.g.*, Gov't Ex. 2 at 5, 6, 7.) The Court also acknowledges that, after his initial "No," Padilla said "Yes" several times when asked if he understood his rights. (*Id.* at 4, 6.) However, even though Padilla began saying "Yes" when asked if he understood his rights, every "Yes" came after Officer Johnson's "Mm-hm" that confirmed Padilla's version of the rights—which did not include the right to have an attorney present during questioning. The record therefore suggests that every time Padilla agreed that he understood his rights, the rights he understood did not include the right to counsel during questioning. Further, Padilla indicated that he wanted to have his rights re-read to him after agreeing that he understood his rights (*id.* at 4), suggesting that he was still confused about their scope. *See United States v. Lewis*, No. 11-20745-CR, 2012 WL 6569373, at *4-8 (S.D. Fla. Dec. 17, 2012) (suppressing statements notwithstanding defendant's oral statement that he understood his rights and defendant's execution of a *Miranda* waiver

form where defendant sought clarification regarding his right to appointed counsel after signing the form and was told he would "go before a judge" and would "get appointed a lawyer"); *see also United States v. Al-Saimari*, 982 F. Supp. 2d 1285, 1287-1292 (D. Utah) (suppressing statements where it was "unclear whether Mr. Al-Saimari understood that he was giving up his right to remain silent and his right to speak to an attorney when he consented to answer Agent Anderson's questions").

In contrast, in *United States v. Castro-Higuero*, the Spanish-speaking suspect asked "[Y]ou mean, I can talk?  Or, or should I keep quiet till [sic] another time" after receiving an interpreted *Miranda* warning, and the officers then "reiterated the Miranda rights" through the interpreter.  473 F.3d 880, 883-84 (8th Cir. 2007) (finding knowing, voluntary, and intelligent waiver where suspect was cautioned that statement could be used against him, but not that statement could be used against him "in court").  Similarly, in *United States v. Gallardo*, after the Spanish-speaking defendant expressed confusion regarding a Spanish-language waiver-of-*Miranda*-rights form, the officer returned with a Spanish-speaking agent, the *Miranda* waiver was re-read, the Spanish-speaking agent answered the defendant's questions and described the significance of the form, and the agent informed the defendant that he could cease the interrogation at any time and request the assistance of an attorney.  495 F.3d 982, 986, 990-91 (8th Cir. 2007) (finding knowing and intelligent waiver).  In *United States v. Morales-Vasquez*, the court found a knowing and intelligent waiver where the defendant had never raised any issues of not being able to understand what was being said and the agent "stated that [Spanish-speaking] defendant looked at him when he was being read his *Miranda* rights, appeared

to understand his rights, did not ask for any clarification or repeating of the rights, and did not appear to be confused."  Case No. 08-cr-264 (DWF/JSM), 2008 WL 4833106, at *4 (D. Minn. Nov. 4, 2008).  Here, Padilla responded "No" when initially asked if he understood the rights that were read to him, responded affirmatively more than once when asked if he wanted the rights re-read to him—which they were not—and, based on his restatement of the rights, did not understand that they included the right to have counsel present during questioning.  Having carefully considered the transcript/translation and recording, the Court finds the Government has not shown by a preponderance of the evidence that Padilla made a knowing and intelligent waiver of his right to have counsel present during questioning.

The Government also argues that Padilla never made a clear and unequivocal request for counsel.  (Dkt. 66 at 8.)  However, because the Court concludes that Padilla was not aware of his right to have counsel present during questioning, the fact that he did not clearly and unequivocally assert that right does not cure the lack of a knowing waiver. *See Smith v. Illinois*, 469 U.S. 91, 98 (1984) ("Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together.").

For these reasons, the Court recommends granting Padilla's Motion to Suppress Statements.

## B.    Motion to Suppress Evidence Obtained as a Result of Search and Seizure

Padilla moves to suppress all evidence obtained during a search of his residence conducted on July 17, 2019 pursuant to a search warrant issued by the Ramsey County

District Court.  (Dkt. 36 at 1.)  He did not submit a supplemental brief in support of this motion after the September 26 hearing.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath of affirmation." U.S. Const. Amend. IV.  An affidavit establishes probable cause for a warrant if it "sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation and citation omitted).  Courts examine the totality of the circumstances to determine if probable cause existed, *United States v. Hager*, 710 F.3d 830, 836 (8th Cir. 2013), and afford great deference to the issuing court's determination of probable cause, *Illinois v. Gates*, 462 U.S. 213, 236 (1983).  The duty of a reviewing court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed.  *Id.* at 238-39.

Deputy Jessen's affidavit states that he was involved with a team of investigators conducting a large-scale drug trafficking operation.  (Gov't Ex. 3 at 2.)  With the assistance of a confidential reliable informant ("CRI"), who had provided independently corroborated information, Deputy Jessen stated that investigators conducted a controlled purchase of a large quantity of methamphetamine.  (*Id.* at 3.)  The affidavit states that officers observed a brown GMC conversion van with license plate 114xxx at the predetermined meeting location.  (*Id.*)  The same vehicle was observed at Padilla's

22

residence on the day of the controlled buy. (*Id.*) The affidavit provides that investigators had observed the vehicle making other short term stops in locations throughout the metro area which, in light of their training and experience, they believed to involve drug trafficking. (*Id.*)

The affidavit states that investigators observed a person deliver a thick white envelope to Padilla's residence and then immediately drive to a bank to make transactions. (*Id.* at 4.) It also states that, in Deputy Jessen's experience, large scale drug organizations will often utilize multiple people to make bank deposits to launder money and avoid detection. (*Id.*) The affidavit further states that less than one week later, investigators observed an individual who was involved in a previous controlled buy arrive at Padilla's residence and leave 1-2 minutes later in the GMC conversion van with a large gray bag. (*Id.*) Investigators believed the bag contained approximately 10-15 pounds of an unknown substance. (*Id.*) Investigators followed the van to another residence they identified as belonging the leader of the drug trafficking organization, Padilla's co-defendant Francisco Caro. (*Id.* at 4-6.) Two days later, investigators observed a male arrive at Padilla's residence without anything in hand and leave a short time later with a grocery bag that investigators believed to contain approximately 2-3 pounds of individually wrapped 1-pound packages, which Deputy Jessen could see bulging outside of the bag. (*Id.* at 5.) The affidavit states that investigators identified where the male resided and detected the presence of cocaine on the outer doorknob of his residence. (*Id.*) The CRI informed investigators that the drug trafficking organization had large quantities of cocaine. (*Id.*)

The affidavit states that investigators observed Caro leave Padilla's residence with a bag carrying 1-2 pounds of an unknown substance. (*Id.*) Caro was later the subject of a traffic stop while driving the GMC conversion van and has not utilized the van subsequently. (*Id.*) The affidavit states that based on the investigators' training and experience, often times people involved in large scale drug trafficking organizations will stop utilizing vehicles after they have been stopped by law enforcement. (*Id.*) Surveillance revealed that Caro began using a red Chevrolet truck and had driven the truck between his residence and Padilla's on several occasions. (*Id.* at 6-7.) Finally, the affidavit states that investigators had observed large containers enter Padilla's residence but not exit, and they had observed smaller quantities of suspected methamphetamine leave Padilla's residence in route to Caro's residence. (*Id.* at 7.)

Padilla argues that the search warrant lacked probable cause because, under the totality of the circumstances, the application supporting the warrant did not support a finding that police would find contraband or evidence of a crime in the residence. (Dkt. 36 at 1-2.) In addition, Padilla argues that the supporting application fails to establish the requisite nexus between criminal activity and the residence. (*Id.* at 2.)

The specific grounds identified by Padilla are that the affidavit describes three instances where officers observed persons carrying packages or containers out of Padilla's residence, surmising that the containers contained controlled substances without providing other facts indicating that the items in the containers were narcotics or contraband. (*Id.*) This argument ignores the fact that courts examine the totality of the circumstances to determine if probable cause existed. *Hager*, 710 F.3d at 836. Here, the

affidavit also stated that the older Hispanic male who left the house carrying a large gray bag had previously participated in a controlled buy of methamphetamine (Gov't Ex. 3 at 4) and one of the bags contained 2-3 pounds of individual packages wrapped in a manner often used to package illegal narcotics (*id.* at 5). The affidavit stated that the doorknob of the individual who carried away the 2-3 pounds of individual packages tested positive for cocaine. (*Id.* at 5.) The affidavit also states that officers had observed several large containers enter Padilla's residence but not exiting, which the officers suspected based on their training and experience contained narcotics. (*Id.* at 7.) Finally, the affidavit stated that co-defendant Caro, whom the investigators suspected was the leader of the drug-trafficking operation based upon surveillance and information from their CRI, had been at Padilla's residence on numerous occasions and left with a package at least once, and that the organization dealt in large quantities of cocaine. (*Id.* at 5-8.) These facts, coupled with the fact that officers had seen people arrive at Padilla's residence empty-handed and leave with smaller packages, support the affiant's assertion that the packages contained controlled substances.

Padilla next claims that the affidavit states that police observed the exchange of a thick white envelope outside his residence without providing any specific facts indicating that whatever was in the envelope was related to narcotics trafficking. (Dkt. 36 at 2.) On the contrary, the affidavit provides that investigators observed a man who appeared to be acting as a lookout during the exchange, and they followed the female who dropped off the envelope directly to a bank where she made transactions. (*Id.* at 4.) The affiant also

stated, based on his training and experience, that trafficking organizations will utilize different people to make bank deposits to launder money and avoid detection.  (*Id.*)

Finally, Padilla also argues that while the affidavit describes how the GMC conversion van and red Chevrolet truck, both involved or suspected of being involved in the distribution of controlled substances, were seen at or driving to or from Padilla's residence, it fails to provide information that the vehicles were presently involved with the distribution of controlled substances or that controlled substances or other contraband would be found in the residence.  (*Id.* at 2.)  The fact that those vehicles were seen at Padilla's residence lends support to the probable cause determination because the vehicles themselves were suspected instrumentalities of the crime, and their presence makes it more likely that evidence of a crime would be found at the house where the vehicles had been observed.

For all these reasons, based on the totality of the circumstances, the Court concludes that the search warrant was supported by probable cause.

Finally, the Court also concludes that the good-faith exception in *United States v. Leon*, 468 U.S. 897 (1984), applies.  Under *Leon*, "'evidence seized pursuant to a search warrant issued by a [judge] that is later determined to be invalid[] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable.'"  *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)).  In *Leon*, the court stated that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in

good faith in conducting the search.'"  468 U.S. at 922 (citations omitted).  However, the

*Leon* court noted that there are certain instances when "the purpose of the exclusionary

rule—deterring police misconduct—will not be served by suppressing illegally seized

evidence."  *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *Leon*, 468 U.S. at

922-23.  "When a police officer acts in an objectively reasonable manner in reliance on a

subsequently invalidated search warrant, there is no rational reason for suppressing the

fruits of the search."  *Martin*, 833 F.2d at 755.  The Court's "good-faith inquiry is

confined to the objectively ascertainable question whether a reasonably well trained

officer would have known that the search was illegal despite the magistrate's

authorization."  *Leon*, 468 U.S. at 923 n.23.  In this regard, evidence obtained as a result

of an unconstitutional search should be suppressed under the following circumstances:

i.    when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

ii.   when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;

iii.  when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

iv.   when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431).  Relevant factors include,

among other things, whether the warrant was issued by an unbiased judge, whether the

officer who requested the warrant was the same officer who executed the warrant,

whether there was probable cause for the search, whether the application was attached to

the warrant, and whether, in the context of the warrant, the officer had a reasonable belief the warrant was limited to the seizure of more particular items.  *See, e.g.*, *United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005); *Curry*, 911 F.2d at 78.

Padilla argues that the *Leon* good-faith exception does not apply because the search warrant was so lacking in indicia of probable cause that a belief in its existence was objectively unreasonable.  (*Id.* at 3.)  Padilla has not explained what is "so facially deficient" about the warrant, and, the affidavit, as described above, contains numerous specific facts supporting the conclusion that there was a fair probability that contraband or evidence of criminal activity would be found in his residence.  Accordingly, the Court finds that the warrant was not so facially deficient that no police officer could reasonably presume it to be valid.

Having found the warrant is supported by probable cause and that the *Leon* good-faith exception applies, the Court recommends that the Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied.

## III.    RECOMMENDATION[8]

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.  Defendant's Motion to Suppress Statements (Dkt. 35) be **GRANTED**.

---

[8]    While this matter was under advisement, Padilla filed a *pro se* motion with the Court.  (Dkt. 75).  Given that Padilla is represented by counsel in this matter, the Court recommends dismissing the motion without prejudice.  *See, e.g.*, *United States v. Agofsky*, 20 F.3d 866, 872 (8th Cir. 1994) (courts have no obligation to entertain pro se motions filed by a represented party).

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and

   Seizure (Dkt. 36) be **DENIED.**

DATED: November 19, 2019                     *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).